**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 15-40456-CJP |
| INES SIMIONI DOMINGOS, | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |
| | ) | |
| PACKER AND MOVITZ, P.C., | ) | |
| | ) | |
| Plaintiff | ) | Adversary Proceeding |
| | ) | No. 15-04042-CJP |
| v. | ) | |
| | ) | |
| INES SIMIONI DOMINGOS, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OF DECISION**

The matter before the Court is the complaint of Packer and Movitz, P.C. ("P&M" or the "Plaintiff") against the debtor defendant, Ines Simioni Domingos ("Domingos" or the "Defendant"), through which the Plaintiff seeks a determination that (i) the debt owed to it by the Defendant, its former client, is nondischargeable under 11 U.S.C. § 523(a)(2)(A)[1] and (ii) the Defendant engaged in unfair or deceptive acts and practices in violation of Mass. Gen. L. ch. 93A ("ch. 93A") §§ 2 and 11 in her dealings with P&M, giving rise to a claim for multiple

---

[1] Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code").

damages and attorneys' fees to be assessed in accordance with that statute. The Court has

considered the testimony and demeanor of the witnesses, the Defendant and Attorney Louis

Movitz ("Movitz"), the trial affidavit of Movitz, the exhibits admitted into evidence, the

pleadings submitted by the parties, and the argument of counsel at the trial. For the reasons

discussed below, the Court finds that P&M did not meet its burden to establish the

nondischargeability of its claim under § 523(a)(2)(A) or that the Defendant should be liable

under ch. 93A. While P&M appears to have provided extensive services to Domingos for which

she promised to pay on a number of occasions, P&M has not proven by a preponderance of the

evidence that her promises to pay were either knowingly false when made or intended to deceive.

Additionally, even if P&M did not waive the ch. 93A claim because it failed to assert it in the

state court litigation between the parties and the firm could demonstrate that the Debtor engaged

in the conduct of trade or commerce in her relationship with it, the Plaintiff has failed to show

that Domingos's conduct constituted an unfair or deceptive business practice as required by the

statute. Accordingly, judgment shall enter in favor of the Defendant as to both counts of the

complaint.

I.    Jurisdiction

A determination as to the dischargeability of the amount claimed by P&M pursuant to §

523(a)(2)(A) is a core proceeding over which the Court has jurisdiction pursuant to 28 U.S.C. §§

157(b)(2)(I) and 1334 and Local Rule 201 of the United States District Court for the District of

Massachusetts. P&M's ch. 93A claim is a non-core matter, which is related to this bankruptcy

case. *See* 28 U.S.C. §§ 1334(b) and 157(a); *see also In re G.S.F. Corp.*, 938 F.2d 1467, 1475 (1st

Cir. 1991), *abrogated in part on other grounds by Connecticut Nat'l Bank v. Germain*, 503 U.S.

2

249 (1992), (quoting *Pacor v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (concluding that "[t]he usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy")). The parties have consented to the entry of a final order on both counts of P&M's complaint. *See* 28 U.S.C. § 157(c)(2).

The following are the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, made applicable by Federal Rule of Bankruptcy Procedure 7052.[2]

II.   Background

The Defendant engaged P&M in November of 2013 to represent her with respect to legal disputes arising from the rehabilitation of a three-family property located at 49 Warren Avenue in Marlborough, Massachusetts (the "Property"). Ex.[3] 1; Defendant's Pretrial Memorandum ("Def. PTM") 3. Domingos, a paralegal, purchased the Property in the summer of 2013 through a short sale and obtained an FHA renovation loan. Domingos hired RCM Services & Painting, Inc. ("RCM") as her contractor to provide services to rehabilitate the Property. RCM ultimately recorded a $48,600 mechanic's lien against the Property after Domingos terminated RCM for nonperformance. Def. PTM 4. The Defendant engaged P&M in connection with the RCM dispute, as well as for a dispute with Radius Financial Group, Inc. ("Radius"), the lender funding the rehabilitation that "had frozen the contract funds it had been disbursing and was threatening to default" Domingos. *Id.*

---

[2] Any finding of fact which is more properly deemed to be a conclusion of law is to be considered a conclusion of law, and any conclusion of law which is more properly deemed to be a finding of fact is to be considered a finding of fact.

[3] Citations to Exhibits admitted in evidence are made herein as "Ex.__."

Movitz first met with Domingos on or about November 5, 2013, along with her ex-husband, Ray Avola. Regarding his understanding of Domingos's financial condition as of her engagement of P&M, Movitz testified that he knew she was a full-time paralegal, she had purchased a three-family property that she was rehabilitating, and she was planning on renting two of the three units at the Property in the future. He also testified he was aware Domingos's ex-husband was helping her pay P&M's retainer and that Domingos was "in a bind" financially and legally, because she had a contractor that did not perform as agreed and funds were tied up as a result.

Domingos and P&M agreed that she would pay the firm $300 per hour, as well as related costs and expenses, to represent her. Ex. 1. It is undisputed that Domingos paid P&M a $1,500.00 retainer and later paid the first bill issued by P&M, in the amount of $4,053.90, in full. Domingos testified that her ex-husband had provided the funds to make those payments. Domingos did not make any further payments to P&M with respect to the six subsequent invoices[4] issued. At some point during P&M's representation of Domingos, RCM's lien was discharged and Radius agreed to allow Domingos to receive further advances to complete the Property renovations with a different contractor. As of September 2014, when P&M informed Domingos that the firm could no longer represent her, the state court litigation that RCM commenced against Domingos had recently concluded with the parties agreeing to arbitrate the matter. Ex. 23. The final invoice issued by P&M on or about September 16, 2014, provided that Domingos owed P&M $32,725.27.

---

[4] The six unpaid bills were dated February 6, 2014, April 4, 2014, June 3, 2014, July 30, 2014, August 26, 2014, and September 16, 2014.

Domingos made specific promises regarding repayment in the context of several telephone conversations and correspondence between the parties. At trial, P&M presented evidence that Domingos made representations during five specific phone calls in 2014 as follows: (i) on February 11, 2014, Domingos stated to Movitz that she intended to refinance the Property, which would provide some funds to pay her legal bills and to pay her ex-husband, who was completing the rehabilitation work on the Property after she fired RCM, Trial Affidavit by Louis Movitz, Esq. ("Movitz Aff.") ¶ 18; (ii) on February 18, 2014, Domingos represented to Movitz "that she would pay her bills in full as soon as she could, because . . . she is not a dishonest person" and would "make at least partial payments toward her increasing balance in March or April of 2014" by using some of the anticipated rental income from the Property and "the proceeds of the refinancing of the Property for which she was applying[,]" Complaint ¶ 15; Movitz Aff. ¶ 19; (iii) on April 15, 2014, Domingos promised Movitz that she would pay the full amount owed to P&M, Movitz Aff. ¶ 20; (iv) on July 9, 2014, she repeated her promises to pay P&M from the rental income and refinancing proceeds, Complaint ¶ 16; Movitz Aff. ¶ 21; and (v) on July 30, 2014, she again repeated her promise to pay her legal bills in full. Complaint ¶ 16; Movitz Aff. ¶ 21; *see also* Ex. 16.

The parties testified extensively regarding the promised sources of income. On or about August 18, 2014, the Defendant sought to refinance her mortgage by submitting a refinancing application to Mortgage Master, Inc. requesting a $308,000.00 loan. Ex. 6. The application was denied pursuant to a "Statement of Credit Denial, Termination, or Change" dated October 6, 2014, because, among other things, Domingos had insufficient income for the amount of credit requested and excessive obligations in relation to her income. Ex. 7. It is undisputed that the loan

amount requested was roughly equivalent to the outstanding liens against the Property and did

not include any excess amount that could have been used to pay P&M. There is also no dispute

that Domingos gave her ex-husband, Avola, a $50,000 mortgage on the Property on August 1,

2014 to secure the amount she owed him pursuant to a $50,000 note of the same date. *See* Exs. 9

and 10.

 With respect to the potential rental income, Movitz testified that he understood that two

of the Property's three units would be available to rent at some point as a result of the

rehabilitation and that the third unit would be occupied by Domingos. Certificates of occupancy

for a four-bedroom first floor unit and a three-bedroom second floor unit issued on or about

May 30, 2014. Exs. 28 and 29. Pursuant to leases submitted into evidence, Domingos rented Unit

1 for a one-year term commencing June 1, 2014 at $1,879 a month and Unit 2 for a one-year

term commencing September 1, 2014 at $1,600 per month. Ex. 11.

 As P&M's representation of Domingos continued, it is undisputed that she began to

question P&M's billing entries and assert that P&M's fees were "out of line" with the results it

obtained. *See, e.g,* September 8, 2014 Letter from Domingos to P&M (the "September Letter"),

Ex. 21. Domingos found some of the bills excessive and believed that counsel charged her for

tasks that she could have completed herself. Ex. 19.

 In the September Letter, Domingos offered to pay P&M either $10,000 in satisfaction of

the unpaid invoices or to make monthly payments of $300 until she paid the entire balance due.

*See* Ex. 21. P&M declined this offer and instead commenced a collection action in Middlesex

Superior Court on October 7, 2014 against the Defendant for breach of contract and account

stated (the "State Court Action"). In the State Court Action, the court granted summary judgment

6

in favor of P&M, and a judgment entered against Domingos, who had been proceeding pro se, in

the amount of $32,725.27, plus interest. Ex. 5. By late January 2015, in an email to P&M from

her then-counsel, who was assisting her in preparing to file bankruptcy, Domingos made a final

offer to pay P&M $5,000 to satisfy her debt. Ex. 25. In February 2015, P&M obtained and

recorded with the Middlesex County Registry of Deeds a $34,477.81 writ of execution on the

judgment.

Domingos filed her chapter 7 bankruptcy petition on March 11, 2015, after contemplating

filing for at least several months. The Court (Hoffman, C.J.) granted Domingos's amended

motion to avoid P&M's judicial lien, and, shortly thereafter, P&M commenced this adversary

proceeding. The Court conducted a trial on this matter and gave the parties the option to file

post-trial briefs. P&M elected to file a brief, and Domingos did not. At the close of briefing, the

Court took this matter under advisement.

III.    <u>Positions of the Parties</u>

A.    <u>The Plaintiff</u>

P&M asserts that the debt owed to it by the Defendant is nondischargeable under §

523(a)(2)(A) because the Defendant made false promises to pay the firm's bills in full

throughout the course of P&M's representation and the firm justifiably relied on those promises

to its detriment. Attorney Movitz ultimately expended over 100 hours of time providing legal

services to the Defendant. P&M contends that the Court should infer that Domingos made her

promises and representations regarding repayment with fraudulent intent based on the

circumstances existing at the time of those representations in the telephone conversations and

correspondence between the parties and the subsequent actions of Domingos. P&M points to the

fact that Domingos failed to make any payments after her promises had been made, that she tried

to convince P&M to accept payment of a portion of the amount owed in satisfaction of her debt,

and that she later filed a chapter 7 bankruptcy case to avoid paying P&M.

P&M highlights other alleged falsehoods Domingos told to bring into question her

credibility and to support P&M's assertion that the totality of the circumstances show that

Domingos falsely represented her intent to pay P&M and induced P&M to provide further

services. Movitz testified that, although Domingos told P&M during the summer of 2014 that

Radius would not allow her to encumber the Property by giving a mortgage to P&M, Domingos

later granted Avola a mortgage on August 1, 2014, to secure a $50,000 note of the same date.

Exs. 9 and 10.[5]  Movitz also testified that Domingos agreed to pay P&M from proceeds of a

refinancing of the debt owed on the Property, as reflected in an email from Movitz to Domingos

dated July 30, 2014 in which Movitz stated that "you have indicated that you will pay us from

the proceeds of your intended refinancing[,]" Ex. 16, only for Domingos to deny in an August

29, 2014 email, Ex. 19, that she ever made such an agreement. P&M also relies on evidence

showing that the Defendant's refinancing application reflects a requested $308,000.00 loan that

would merely cover outstanding liens on the Property, leaving no refinancing funds available to

pay P&M as allegedly agreed. Ex. 6. P&M also asserts that lease agreements admitted into

evidence show that at least one of the units at the three-unit Property was rented as of June 1,

2014, demonstrating that Domingos's promises to use the Property's rental income to pay P&M

---

[5] P&M also asserts that Domingos denied making such a statement at her deposition conducted on or about November 19, 2015, the transcript of which P&M did not introduce into evidence.

8

were fraudulent because she did not use any rental income she presumably received pursuant to those leases to pay P&M. Ex. 11.

More tangentially, P&M asserts that the Defendant (i) engaged in a pattern of nonpayment with her legal advisors, citing testimony of Domingos that her initial bankruptcy counsel also was not paid in full, but instead accepted a reduced amount from Domingos; (ii) contemplated bankruptcy as early as April of 2014; and (iii) misrepresented the circumstances of her unemployment as a paralegal, regarding which Movitz testified that Domingos told him that she was out of work because she had been laid off, when she had instead left for other reasons.

P&M asserts that Domingos knew that the material representations she made to the firm were false or in reckless disregard of the truth, that she intended to deceive P&M into acting in reliance on such representations, and that P&M justifiably acted in reliance on those representations by continuing to provide legal services to her and incurring additional expenses. As a result, P&M asserts that Domingos's debt is nondischargeable.

P&M also contends, based on the same purported false representations and false pretenses, that the debt owed by Domingos is one resulting from unfair and deceptive trade practices for which P&M should be entitled to damages, costs, and fees under ch. 93A. P&M concedes it did not assert a ch. 93A claim in its State Court Action. Alternatively, P&M argues that it has a ch. 93A claim arising after the State Court Action because Domingos filed for bankruptcy in an attempt to avoid paying her debt to P&M.

B.  The Defendant

Domingos asserts that P&M has not met its burden because the evidence does not demonstrate that she obtained the firm's services by false pretenses, made false representations,

or committed actual fraud. She testified that she acted in good faith in her dealings with P&M and that at all times she intended to pay P&M for its services. She points to the fact that she paid both a retainer and the first legal bill in full as evidence consistent with her intent. Domingos does not dispute that she promised to pay P&M on various occasions or the substance of the telephone calls and correspondence to which Movitz testified. Instead, Domingos testified that she was unable to pay P&M because of financial hardships due to her limited income, an extended period during which she was unable to rent the Property units, and her inability to refinance the mortgage on the Property despite an effort to do so. She testified that P&M understood her tenuous financial condition from the outset of its representation and that she never hid the fact that she would pay her obligations "as soon as she could."

Domingos specifically testified to the reasons why she could not apply for a refinancing of the mortgage on the Property at an amount that may have provided funds to pay P&M, including that her application was denied on the basis that she had insufficient income for the amount of credit requested and excessive obligations in relation to her income. Ex. 7. She also testified as to the timing of the rental of her units and her ex-husband's withholding of the required de-leading certificates until she granted him a mortgage to secure the funds owed to him for supervising the rehabilitation.[6] She stated that she hoped a refinancing would free up some

---

[6] Domingos's relationship with her ex-husband appears to be complex, given her testimony regarding his assistance with paying P&M's retainer and rehabilitating the Property, coupled with his later stand on delaying the release of the de-leading certificates and obtaining a note and mortgage from her. Domingos compellingly explained what underlies this seemingly complicated relationship by testifying as to her circumstances as a Brazilian immigrant who met Avola after she came to the United States alone, but whose relationship with him did not last due to familial pressures. P&M did not call Avola as a witness or directly question Domingos regarding the nature of this relationship, and the Court is not compelled to look disfavorably upon Domingos's credibility as to her testimony regarding her ex-spouse's involvement

funds to pay her legal bills and her ex-husband, but that, given the reasons the lender provided

for the denial of her initial application, it made no sense to reapply without changed

circumstances.

Domingos also testified that in the summer of 2014 her financial stresses took a toll on

her mental and physical health and caused her to leave her employment as a paralegal, to which

she was not able to return until August of 2015. She stated that during that period she was under

great stress, depressed, and suffered from fibromyalgia and panic attacks. She testified she left

her paralegal job because of the panic attacks and that she was "crying all over the place." She

further testified that in addition to suffering from joint pain, she needed to go to the hospital on

two or three occasions because she felt she was having a heart attack, she was referred to a

mental health specialist and she was prescribed medications for anxiety and depression.

The Defendant also states that she perceived that P&M's fees were excessive based on

the results obtained by the firm and because, as a paralegal, she felt that she had assisted in

P&M's efforts by gathering the supporting documentation used by the firm and could have done

some tasks herself, and so informed P&M. *See* Exs. 19 and 21. Domingos contends that P&M

was aware of her financial circumstances from the outset of the representation and that by

continuing to represent her, it assumed the risk that she would not be able to pay for all of the

services the firm provided and the expenses it incurred.

With respect to the ch. 93A claim, the Defendant argues that she was not engaged in

commerce, but was acting in a non-business capacity in her interactions with P&M, precluding

---

given the Plaintiff's burden in the context of supporting a nondischargeability claim.

application of that statutory provision in this matter.[7] She also denies having engaged in any

unfair or deceptive business practice.

IV.   <u>Discussion</u>

   A.  <u>§ 523(a)(2)(A)</u>

   Section 523(a)(2)(A) excepts from discharge a debt of an individual debtor, "for money,

property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by . .

. false pretenses, a false representation, or actual fraud, other than a statement respecting the

debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). The Plaintiff must

establish that the debt is excepted from discharge by a preponderance of the evidence. *See*

*Grogan v. Garner*, 498 U.S. 279, 291 (1991). "Exceptions to discharge are narrowly construed in

furtherance of the Bankruptcy Code's fresh start policy, and, for that reason, the claimant must

show that [its] claim comes squarely within an exception enumerated in Bankruptcy Code §

523(a)." *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997) (quoting *Century 21 Balfour*

*Real Estate v. Menna (In re Menna)*, 16 F.3d 7, 9 (1st Cir. 1994)) (internal quotations omitted).

If the Plaintiff fails to establish any one of the necessary elements of § 523(a)(2)(A), then the

Court must reject the claim. *See id.* at 787-88.

   As the First Circuit has explained, those necessary elements for a claim based on false

representations[8] are as follows:

---

[7] Additionally, Domingos asserts as an affirmative defense in her answer that the complaint violates Fed.
R. Bankr. P. 9011(b) because any such claim is barred by res judicata arising from the state court
judgment and requests that P&M be sanctioned. The Court need not address this request, however, as it is
procedurally deficient under Fed. R. Bankr. P. 9011 and has been abandoned, in any event, as the
Defendant failed to prosecute it beyond the context of the answer.

[8] "Where the exception is based on false pretenses, the requirements are largely the same, except that the

> 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the misrepresentation, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage.

*McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir. 2001) (citing *Palmacci*, 121 F.3d at 786).

The "concept of misrepresentation includes a false representation as to one's intention, such as a promise to act." *Palmacci*, 121 F.3d at 786. Hence, a false promise may constitute a false representation of intent:

> [i]f, at the time he made his promise, the debtor did not *intend to perform*, then he has made a false representation (false as to his intent) and the debt that arose as a result thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met). If he did so intend at the time he made his promise, but subsequently decided that he could not or would not so perform, then his initial representation was not false when made.

*Id*. at 787. In the absence of direct evidence, a court may infer intent to deceive from surrounding circumstances; however, "there still must be evidence of the circumstances which the plaintiff believes present a picture of the deceptive conduct." *In re Leger*, 34 B.R. 873, 878 (Bankr. D. Mass. 1983). The court may choose to infer such intent or not based on all of the evidence.

*Palmacci*, 121 F.3d at 790.

---

requirement of a false representation is replaced by a requirement of a false pretense, which is an implied misrepresentation or a false impression created by conduct of the debtor." *Old Republic Nat'l Title Ins. v. Levasseur (In re Levasseur)*, 482 B.R. 15, 29 (Bankr. D. Mass. 2012), *aff'd*, 737 F.3d 814 (1st Cir. 2013). "'[W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression. This is the basis of the false pretenses provision of Section 523(a)(2)(A).'" *Id*. at 29 (quoting *Merchants Nat'l Bank of Winona v. Moen (In re Moen)*, 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999)) (internal quotations omitted).

13

The Court also may consider subsequent conduct of the debtor as it may reflect the debtor's state of mind at the time a representation was made. *Williamson v. Busconi*, 87 F.3d 602, 603 (1st Cir. 1996). "A debtor's mere failure to perform[, however,] is not sufficient evidence of scienter nor is subsequent conduct contrary to the original representation necessarily indicative of fraudulent intent." *DeBenedictis v. Brady-Zell (In re Brady-Zell)*, 500 B.R. 295, 302 (B.A.P. 1st Cir. 2013) (quoting *Bellas Pavers, LLC v. Stewart (In re Stewart)*, BAP No. MB 12-017, 2012 WL 5189048, at *8 (B.A.P. 1st Cir. Oct. 18, 2012)) (internal quotations omitted). "A debtor's statement of future intention is not necessarily a misrepresentation if intervening events cause the debtor's future actions to deviate from previously expressed intentions." *Id.* (*citing Palmacci*, 121 F.3d at 786-87).

Moreover, courts have found that, even if a debtor's testimony is found to be self-serving and not entirely deserving of credence, a finding of nondischargeability requires more than a showing that the debtor exhibited such a character flaw; the moving party seeking nondischargeability must, nonetheless, meet its burden with respect to all elements and ultimately show that promises to pay were either knowingly false when made or intended to deceive. *See DeBenedictis v. Brady-Zell (In re Brady-Zell)*, Adv. P. No. 10–1119, 2013 WL 1342479 (Bankr. D. Mass. Apr. 2, 2013), *aff'd*, 500 B.R. 295 (B.A.P. 1st Cir. 2013), *aff'd*, 756 F.3d 69, 72 (1st Cir. 2014) (affirming bankruptcy court's decision that plaintiff failed in her burden of proof where evidence was "'split about even'").

In *Brady-Zell*, the Court examined the totality of circumstances as to whether to infer fraudulent intent on the part of a debtor who made several promises to pay counsel's fees in a factually similar case in which the debtor's divorce attorney sought a non-dischargeability

14

determination with respect to those fees. *See id*. at *8. The Court found that the debtor in that

case had:

> by no means proven that she did intend to honor her promise. She was in almost
> every respect not credible in her testimony, and the evidence showed her to be
> capable of misrepresentations in important matters. . . . She offered no testimony
> or other explanation as to why, in view of her indications to deBenedictis that
> payment of this debt was a priority, this debt did not get paid. . . . If the burden were
> on [the debtor], she would lose. I certainly cannot find that she has acquitted herself
> of the alleged misrepresentation.

*Id*. at *7. Since the Court concluded that the totality of the circumstances was inconclusive, "with

the weight of the evidence split about even" and without "a tipping of the balance in favor of the

plaintiff[,]" the Court could not find the requisite intent under § 523(a)(2)(A) and necessarily

resolved the issue in favor of the defendant. *Id*. at *8. The First Circuit Court of Appeals

recognized that the Bankruptcy Court had found the debtor's testimony not to be credible, but,

nonetheless, affirmed its findings explaining that:

> [w]e are not aware of any rule that mandates a finding of nondischargeability
> against a party simply because her testimony lacks candor. Although we do not
> countenance untruthful testimony, a finding of nondischargeability requires more
> than a showing that the debtor exhibited a serious character flaw. The attorney, who
> had the burden of proof, made no such additional showing here.

*Brady-Zell*, 756 F.3d at 72–73. Therefore, even if a debtor's credibility is at issue, the party with

the burden of proof must still make the required showing that would tip the balance of the weight

of the evidence in its favor.

Furthermore, the party upon whom the misrepresentation is directed must actually have

relied on the false pretense or false representation and that reliance must have been justifiable

(but need not have been reasonable). Reliance is justifiable if the falsity of the representation

15

would not have been readily apparent to the person to whom it was made. *Field v. Mans*, 516

U.S. 59, 70-72 (1995).

B.  Chapter 93A

To prevail on a claim pursuant to ch. 93A, P&M must initially demonstrate that it did not

waive any claim under ch. 93A by failing to assert that claim in the State Court Action. If the

claim has not been waived, the Plaintiff must show that the conduct of Domingos it contends

supports a determination of non-dischargeability constituted unfair "methods of competition and

unfair or deceptive acts or practices in business transactions" within the purview of ch. 93A, §§ 2

and 11.

Section 2(a) makes unlawful any "unfair or deceptive acts or practices in the conduct of

any trade or commerce." M.G.L. ch. 93A, § 2(a). Section 11 extends the prohibition set forth in

section 2 to those engaged in trade or commerce in business transactions with others similarly

engaged. *See id.* at § 11; *see also Anthony's Pier Four, Inc. v. HBC Assoc.*, 583 N.E.2d 806, 821

(Mass. 1991). Substantive liability under ch. "93A requires a showing of conduct that (1) falls

within 'the penumbra of some common-law, statutory, or other established concept of

unfairness'; (2) is 'immoral, unethical, oppressive, or unscrupulous'; and (3) causes 'substantial

injury to [consumers or other businesspersons].'"*Jasty v. Wright Med. Tech., Inc.*, 528 F.3d 28,

37 (1st Cir. 2008) (quoting *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 15 (1st Cir. 1999)).

The Court recognizes that a violation of ch. 93A, § 2 can be founded on behavior that

lacks the characteristics of misconduct necessary to support a finding of nondischargeability for

actual fraud. *See, e.g., Commonwealth of Mass. v. Hale*, 618 F.2d 143, 146–47 (1st Cir. 1980)

(examining nondischargeability under § 17(a)(2) of Bankruptcy Act, the predecessor of §

16

523(a)(2)(A), and finding an "unfair or deceptive act or practice" may be established without

proof that the defendant knew his or her false representation to be false and without proof that

the plaintiff relied on the representation). For the Court to determine that a debt arising from

such a claim would be non-dischargeable, however, P&M still has the burden to demonstrate by

a preponderance of the evidence that the conduct establishing the ch. 93A claim satisfied the

elements of § 523(a)(2)(A) as well.

V.    Analysis

P&M contends that that its judgment debt is excepted from discharge as one for an

extension of credit obtained by false pretenses and false representations. While it is undisputed

that Domingos failed to pay the majority of P&M's bills, the totality of the circumstances does

not support a finding that she falsely represented her intent to pay P&M in order to induce P&M

to continue to provide services such that the debt owed to P&M should be nondischargeable

under § 523(a)(2)(A). Rather, the inference drawn by the Court from all of the evidence

presented and after assessing the demeanor of Domingos on the stand is that, although she was

not credible in her contention that the scope of P&M's representation was not as she intended,

this was tempered by evidence that she was overwhelmed by financial difficulties stemming

from the rehabilitation of her Property, which were exacerbated by her mounting legal bills.

Even though the Defendant eventually took issue with some of P&M's fees, seemingly

unreasonably given the timing of the complaints, and did not prioritize payment of P&M's

invoices, the Defendant was nonetheless credible when she described her desperation and need to

pay bills for living expenses and in connection with the rehabilitation project. She was also

credible when she testified that she never intended to obtain services for which she would not

17

pay and that it was always her intention to pay "as soon as she could"—even if that meant that P&M would have to make arrangements with her for payments over time. The Defendant's circumstances continued to change based on intervening events, and P&M appeared to have been aware of facts that would make clear that Domingos did not have the ability to pay for its services immediately. While the facts of this case raise questions with respect to Domingos's credibility on certain issues before the Court, the evidence is not "split about even" as in *Brady-Zell* and the balance of the weight of the evidence falls in the Defendant's favor given P&M's burden of proof under § 523(a)(2)(A). *Brady-Zell*, 2013 WL 1342479, at *8.

P&M was a sophisticated party that took a risk by providing legal services to Domingos after quickly exhausting its retainer when it knew that Domingos was in a financial "bind" and needed assistance from her ex-husband to pay P&M's retainer. Domingos testified that she had informed Movitz that she had no current ability to pay legal bills. She testified that she was "hoping" to eventually receive funds from working, a refinancing, and rental income to be able to pay all of her bills. She also testified that she had never had to "deal with" issues such as were affecting her and that during the period from April to August of 2014, she was under pressure from her ex-husband regarding amounts owed to him, from P&M regarding her legal matters and its outstanding invoices, and because of her financial situation. Domingos testified to significant resulting health issues for which she continues to be treated.

P&M does not assert that Domingos made any false representations as to her intent to pay P&M when the parties first entered into their contractual relationship. Indeed, Domingos paid P&M both a $1,500 retainer and the $4,053.90 due under the November 25, 2013 bill. It was only when subsequent bills were issued that she failed to make further payments. P&M asserts

18

that the Defendant's subsequent representations of intent to pay were made fraudulently to induce P&M to continue to provide legal services.

Domingos testified that, at the time she promised to pay P&M during two phone calls in February 2014, and on a third phone call in April 2014, she intended to pay P&M when she was able to generate sufficient funds to do so, but that she did not have the ability to pay at that time. P&M continued to provide services after each call despite the fact that Domingos continued to be unable to make a payment. The Defendant testified that she attempted to follow through on her promises by working to generate rental income from the two additional units at her Property, which required her to obtain de-leading certificates from her ex-husband and certificates of occupancy to be able to rent them.

It is unrefuted that Domingos did not receive the certificates of occupancy necessary to begin renting the two Property units until May 30, 2014. By May 31, 2014, she entered into a lease commencing on June 1, 2014 to rent Unit 1. *See* Ex. 11. Domingos leased Unit 2 shortly thereafter pursuant to a lease dated August 4, 2014, the term of which commenced on September 1, 2014. *See id*. The delays in renting the units negatively impacted Domingos's cash flow and she testified that she could not seek to refinance until she established rental income.

While Domingos again stated her intent to pay P&M on two phone calls in July of 2014, she testified that she had expressed concern about some of the legal bills she had received from P&M. Domingos found some of the bills excessive and believed that counsel charged her for tasks that she could have completed herself. Ex. 19. Nevertheless, in an August 29, 2014 email, Domingos confirmed that she intended to pay P&M what was fair. This evidence does not

19

compel the Court to infer that she falsely represented her intent to pay P&M in July of 2014. Most of P&M's services had been provided by the time of these calls.[9]

Similarly, the interaction of the parties with respect to P&M's requested mortgage and the granting of a mortgage to Avola does not demonstrate by a preponderance of the evidence that Domingos intentionally misrepresented her intention to pay P&M to induce the firm to continue to provide services. The Court cannot conclude that Domingos made a misrepresentation from the fact that she executed a $50,000 note and granted Avola a mortgage on the Property in August 2014, after she allegedly told P&M that Radius would not allow her to further encumber the Property. Nor can the Court make such a conclusion after considering the Defendant's testimony regarding her mental state at the time, her need for the certificates of occupancy which she testified were being held up by Avola and his withholding of the de-leading certificates, and her desire to begin renting the Property units. Moreover, no evidence was introduced that would directly support a finding that the Defendant's statement regarding Radius's restriction on additional Property encumbrances was not true. Domingos was not asked to testify as to the source of her understanding regarding Radius and whether it was based on restrictive covenants in the Radius mortgage or on communications with Radius.

Domingos's failure to refinance her home mortgage debt similarly does not support a finding that she did not intend to pay P&M as she represented. Domingos attempted to refinance her mortgage by submitting a Uniform Residential Loan Application on August 18, 2014, only to

---

[9] By the end of July 2014, P&M had extended the bulk of its services to Domingos. The itemized invoices dated August 26, 2014 and September 9, 2016, covering fees and expenses related to time entries from August 1, 2014 through September 16, 2014, totaled only $1,055.05. *See* Ex. 2.

have it denied on October 6, 2014, because she had insufficient income for the amount requested

and excessive obligations in relation to her income. Exs. 6 and 7. The fact that Domingos sought

to refinance only $308,000 in debt, which would not have provided any extra funds above the

liens against the Property, does not itself show that she did not intend to pay P&M. The

Defendant testified that the refinancing would eliminate the need for private mortgage insurance,

which would provide her with a lower monthly mortgage payment and free up additional funds

to pay P&M and other expenses. The Court views this evidence to reflect Domingos's effort to

improve her financial situation, which was ultimately unsuccessful. P&M also points to the fact

that the Defendant only sought to refinance her mortgage once as evidence that she was not

committed to refinance; however, the Defendant's testimony was persuasive that she did not

believe it would be reasonable to submit additional refinancing applications once her initial

application was denied because, *inter alia*, her financial circumstances had not changed and she

had an insufficient monthly income.

The evidence regarding Domingos's offers to settle her debt with P&M also do not

compel an inference that earlier representations of her intent to pay were fraudulently made. By

early September 2014, P&M had informed Domingos that it could no longer represent her. In

this context, Domingos offered to pay P&M $10,000 to settle her debt, or to enter into a

repayment plan where she would pay $300 per month. Exs. 21 and 24. Domingos testified that

she would have tried to borrow the funds from her brother to pay the lump sum amount. P&M

did not accept this offer. It also declined to accept a January 2015 offer of $5,000, made

approximately two months before Domingos filed her bankruptcy petition. Although P&M may

have found Domingos's settlement offers unacceptable, the Court does not infer from the offers,

21

combined with the other evidence introduced at trial, that she did not intend to pay P&M as promised during various phone calls.

While the results are unfortunate, as P&M appears to have provided services that were beneficial to the Domingos and it appears that Domingos used her limited resources to pay her living expenses and less patient creditors, P&M is a sophisticated party, a law firm that was aware of Domingos's financial difficulties from the outset of its representation of Domingos. P&M counseled Domingos as to the very issues that negatively impacted her financial situation. Nevertheless, P&M continued to represent her for eight months without additional payments, even when the Defendant took issue with the scope of work being undertaken and her intentions to pay were known to be reliant on future cash flow and refinancing plans that were contingent and optimistic. P&M assumed the risk of nonpayment and suffered for the patience and professional responsibility exercised with respect to its client.

Because P&M has failed to show by a preponderance of the evidence based on the totality of circumstances that Domingos falsely represented her intent to pay P&M and that P&M reasonably relied on those representations, it has not met its burden under § 523(a)(2)(A) and the Court need not address any of the other elements. The discharge entered in this case shall operate to discharge the debt owed by Domingos to P&M, including, without limitation, pursuant to the State Court Action judgment.

For the reasons stated above, the Court finds that P&M has also not met its burden to demonstrate that Domingos engaged in unfair or deceptive business practices as alleged in P&M's separate count under ch. 93A or that such a claim would be nondischargeable even if the

22

Court assumes that such claim had not been waived and that the Debtor was "engaged in commerce or business."

VI.     <u>Conclusion</u>

Based on the forgoing, the Court shall enter judgment in favor of the Defendant and against the Plaintiff with respect to both counts of the complaint.

Dated: March 31, 2017                        By the Court,

_____
Christopher J. Panos
United States Bankruptcy Judge